1

2

3

4

5             IN THE UNITED STATES DISTRICT COURT

6           FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    JESSICA BATES, et al.,                    No. C 05-3383 SI

9            Plaintiffs,                       **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANTS'**
10      v.                                     **MOTION FOR SUMMARY JUDGMENT**

11   SAN FRANCISCO SHERIFF'S
     DEPARTMENT CHIEF ARATA, et al.,
12
             Defendants.
13   _____/

14
            Now before the Court is defendants' motion for summary judgment.  After the hearing on the
15
     motion, the parties submitted supplemental briefing and, in December 2007, jointly filed video evidence.
16
     Having considered the arguments of counsel and the parties' submissions, the Court GRANTS in part
17
     and DENIES in part defendants' motion for the reasons set forth below.
18

19
                                       **BACKGROUND**[1]
20
            On June 8, 2004, plaintiffs participated in a protest against the Summit on Biotechnology taking
21
     place at the Moscone Center in San Francisco.  The protest was un-permitted.  Defendants assert that
22
     various protesters were engaged in illegal and dangerous activities such as bumping into and hitting
23
     vehicles.  Plaintiffs do not admit to being involved in any such activity.  At some time between 5:00 pm
24
     and 6:30 pm, San Francisco Police Department (SFPD) officers encircled protestors, including plaintiffs,
25

26   _____

27        [1] The parties have stipulated to certain facts related to plaintiffs' initial arrest and conduct at the
     time of arrest (Loebs Decl., Ex. F), and categories of conduct by the SFSD defendants (Loebs Decl., Ex.
28   G).  Where facts are disputed, the Court has so noted.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

on Market Street near 5th Street.[2]  The parties have stipulated that at the time the group was surrounded, plaintiffs were engaged in a protest march and were standing in parts of the roadway in which cars normally drive.  Loeb Decl., Ex. F ¶ 1.  The parties also agree that at various times while plaintiffs were protesting and standing in the roadway, plaintiffs were blocking some vehicular traffic, *id.*, and that at various times while plaintiffs were in the street, they were both inside and outside of marked or unmarked crosswalks and "proceeded against red light(s) and/or did not cross at signals."  *Id.*  After encircling the protesters, the SFSD officers told the protesters that they were under arrest.  Plaintiffs allege that the officers did not warn them that their actions were in violation of the law, nor did they order plaintiffs to disperse.  TAC ¶ 33.

SFPD officers detained plaintiffs on Market Street for approximately four hours, and gave the protesters traffic citations for violating Vehicle Code §§ 2800(a) (failure to comply with a lawful order) and 21954(a) (failure by pedestrian to yield to a vehicle).  Thereafter, 116 individuals, including plaintiffs, were brought to San Francisco County Jail No. 9 where the detainees were initially held in outdoor holding pens in the sally port.  Loebs Decl., Ex. G ¶ 3.  Detainees who provided identification to the police were eventually cited and released.  *Id.*  The sixteen plaintiffs in this action, along with other individuals who are not plaintiffs, were not released because they refused to provide their names and identifying information to the San Francisco Sheriff's Department (SFSD).  *Id.*

After plaintiffs refused to provide their identification, SFSD officers placed them in holding cells inside County Jail No. 9.  *Id.*  Plaintiffs were divided into two holding cells, one for women and one for men.  *Id.*  Plaintiffs allege that they while they were kept in County Jail No. 9, they were denied bedding, working toilets, sanitary supplies, "basic food and sustenance (including frequent enough food, healthy enough food, and food conforming to requested vegetarian and vegan diets)," and experienced "interruptions in phone service, including denial of access to phones for many hours after booking," and "deprivation of reasonable access to counsel."  TAC ¶ 105.  Plaintiffs also allege that SFSD officers opened the cover on the door of the women's holding cell, which allowed for a view of the restroom area in order to create a "peep show."  *Id.* ¶ 132.  Plaintiffs admit, however, that at no point was any

---

[2] Defendants state that this occurred at 5:00 pm, whereas plaintiffs state it occurred at 6:00 pm.

United States District Court
For the Northern District of California

1  female detainee using the restroom while this allegedly happened.  *Id.*

2      After providing plaintiffs numerous opportunities to identify themselves, the SFSD decided to

3  remove plaintiffs from the holding cells in County Jail No. 9 in order to book and house them in the jail

4  facilities. Loebs Decl., Ex. G ¶ 4.  Defendants state that they had to move plaintiffs because County Jail

5  No. 9 is only a short-term holding facility.  Brin Decl. ¶¶ 4-5.  The process of removing plaintiffs from

6  the holding cells began at approximately 5:00 pm on June 9, 2004.  Certain plaintiffs refused to leave

7  the holding cells, Loebs Decl., Ex. G ¶ 4, and as a result, SFSD officers used force to extract

8  noncomplying plaintiffs from the holding cells in order to begin the booking process.  *Id.* ¶ 5.  Plaintiffs

9  who refused to be extracted held onto each other and/or to objects in the holding cells.  *Id.*  Plaintiffs

10  allege that the officers did not warn them that their refusal to leave would result in the use of force.

11  Plaintiffs also allege that SFSD officers put blankets up around the holding cells before the extraction

12  process to "torment" the plaintiffs.  TAC ¶ 105.  Certain plaintiffs refused to comply with aspects of the

13  booking process, such as fingerprinting.  Loebs Decl., Ex. G ¶ 5. As a result, SFSD officers used pain

14  compliance techniques to gain their cooperation.  *Id.*

15      After the booking process was complete, plaintiffs were housed in County Jail No. 8, a long-term

16  jail facility.  *Id.* ¶ 6.  Plaintiff Rasti alleges that she was housed separately from the other plaintiffs

17  because of the color of her skin.  TAC ¶ 157.  Defendants deny that the color of Rasti's skin was a factor

18  in determining where to house her.  Brin Decl. ¶ 30.

19      On June 10, 2004, following negotiations between the SFSD and plaintiffs' attorneys, plaintiffs

20  agreed to provide their identification to the SFSD and were transported to San Francisco Superior Court.

21  According to the transcript of the hearing, the District Attorney withdrew the complaint against

22  plaintiffs for violating California Vehicle Code § 21954(a) pending further investigation, but did not

23  dismiss the charges.  Loebs Decl., Ex. D, 13:19-26.   Thereafter, the Superior Court determined that

24  plaintiffs had already served sufficient time and dismissed the §21954(a) infraction.  *Id.* at 15:11-14.

25  It is unclear from the record what happened to plaintiffs' citation for Vehicle Code § 2800(a).  Plaintiffs

26  were then released.

27      Defendants filed the instant motion for summary judgment on April 20, 2007, relying on the

28

allegations set forth in plaintiffs' Third Amended Complaint.[3]  In their opposition, plaintiffs agree to dismiss the sixth and eleventh causes of action, and their prolonged detention allegations that are part of the fifth cause of action.  Plaintiffs also agree to dismiss all claims against defendant Richard Segovia.

**LEGAL STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party.  *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible.  *See* Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

---

[3] Plaintiffs delivered their Third Amended Complaint to defendants' counsel on March 8, 2007, and filed the complaint after the instant motion was filed.

4

United States District Court
For the Northern District of California

# DISCUSSION

## I.     Six plaintiffs' state law claims

Defendants contend that the state law claims of six plaintiffs fail as a matter of law because those plaintiffs did not file government tort claims.[4]  Plaintiffs' December 8, 2004 tort claim states that it is filed on behalf of "twenty (20) men and eighteen (18) women" and that "[n]ot all the claimants' names and DOBs are known at this time."  Haase Decl., Ex. K.  The tort claim lists the names of 11 individuals; the six plaintiffs at issue here are not listed.

Plaintiffs argue that the December 8, 2004 claim substantially complies with the tort claim requirement because the claim provided the SFSD with notice and sufficient information to allow it to investigate the matter.  Plaintiffs assert that although plaintiffs' counsel did not know the names of the six claimants at the time, SFSD knew who had been arrested.  Plaintiffs also argue that SFSD waived any defect in the claim by failing to provide written notice of the insufficiency.

"Where a claimant attempted to comply with the claim requirements but the claim is deficient in some way, the doctrine of substantial compliance may validate the claim if it substantially complies with all of the statutory requirements . . . even though it is technically deficient in one or more particulars."  *Connelly v. County of Fresno*, 146 Cal. App. 4th 29, 38 (2006) (internal citation and quotations omitted).  The California Tort Claims statute requires, *inter alia*, that "[a] claim shall be presented by the claimant or by a person acting on his or her behalf and shall show all of the following: (a) The name and post office address of the claimant. . . ."  Cal. Gov't Code § 910.

Here, the December 8, 2004 claim does not list the six plaintiffs, nor is there any evidence in the record that plaintiffs' counsel had the authority at that time to file the claim on their behalf.  The claim does not comply with the statutory requirement of including the name and post office address of the six plaintiffs.  Plaintiffs have not cited any authority applying the doctrine of substantial compliance to a situation where a plaintiff has completely omitted a required element of a tort claim, and indeed, "[t]he doctrine of substantial compliance, . . . cannot cure total omission of an essential element from the claim or remedy a plaintiffs' failure to comply meaningfully with the statute."  *Loehr v. Ventura County*

---

[4] The six plaintiffs are: Allen, Silverman, Sorensen, Sovik, Spafford and Stribling-Uss.

*Community College Dist.*, 147 Cal. App. 3d 1071, 1083 (1983); *see also Nelson v. County of Los Angeles*, 113 Cal. App. 4th 783, 797 (2003) ("Where two or more persons suffer separate and distinct injuries from the same act or omission, each person must submit a claim, and one cannot rely on a claim presented by another."). Accordingly, the Court finds that defendants are entitled to summary judgment on the six plaintiffs' state law claims based on the failure to file a tort claim.

## II.     California Constitution claims

Defendants argue that plaintiffs' claims under the California Constitution fail as a matter of law because the sections relied upon by plaintiffs – Article I §§ 1, 2, 7 and 13 (privacy, freedom of speech and expression, due process and illegal search and seizure, respectively) – do not recognize a private right of action for damages. Plaintiffs agree to dismiss their Article I § 2 claim regarding freedom of speech and expression.

Plaintiffs cite *White v. Davis*, 13 Cal. 3d 757, 775 (1975), for the proposition that the California Constitution, Article I § 1 permits a private right of action for a privacy violation. In *White*, the plaintiffs brought a taxpayer's suit under Section 526a of the Code of Civil Procedure to enjoin the allegedly illegal expenditure of public funds in connection with a police department's conduct of covert intelligence gathering. *Id.* at 762-63. The California Supreme Court held that the alleged police surveillance activities constituted a *prima facie* violation of the constitutional right to privacy under Article I § 1. *Id.* at 776. *White* did not address whether Article I § 1 created a private right of action.

To create a private right of action, a constitutional provision must "suppl[y] a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced." *Clausing v. San Francisco Unified School Dist.*, 221 Cal. App. 3d 1224, 1237 (1990) (internal quotation marks and citation omitted). A constitutional provision does not create a private right of action "when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." *Id.* Article I, section 1, of the California Constitution states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." This provision does not establish the means by which these inalienable rights

may be enjoyed, defended, or otherwise given the force of law. *See id.* at n.6 ("No case has ever held that [Article I, § 1] . . . is self-executing in the sense that it gives rise . . . to a private right of action for damages or an affirmative duty on the part of the state to take particular steps to guarantee the enjoyment of [the rights] by all citizens."). Accordingly, the Court does not recognize a private right of action for damages under Article I § 1. Plaintiffs concede that California courts have not addressed whether a private cause of action for damages is created by either Article I §§ 7 or 13, and the Court declines to recognize such claims in this case. The Court GRANTS defendants' motion for summary judgment on plaintiffs' claims for damages under the California Constitution.

### III.    Claims against San Francisco Police Department Captain Martel

All sixteen plaintiffs bring the first and second causes of action against SFPD Captain Dennis Martel. Cause of action one alleges that Martel is liable under 42 U.S.C. § 1983 for unnecessary, unreasonable and unlawful arrest and detention in violation of the Fourth Amendment. Cause of action two alleges false arrest and false imprisonment under the California Constitution, Article I §§ 1 and 13, the California Penal Code § 853.6 and California Common Law.[5] Defendant Martel argues that plaintiffs' claims fail because he had probable cause to arrest and detain them at 5th and Market Streets. Martel further argues that even if he did not have probable cause to arrest plaintiffs, he is entitled to qualified immunity.

### A.    False arrest – federal claim

Plaintiffs contend that Martel violated their Fourth Amendment rights to be free from false arrest and false imprisonment because (1) Captain Martel did not have probable cause for the two citations

---

[5] As set forth above, the Court declines to recognize plaintiffs' claims under the California Constitution.

1    pursuant to California Vehicle Code §§ 2800(a)[6] and 21954(a)[7]; (2) Captain Martel did not have

2    probable cause for the other offenses for which plaintiffs were not cited; and (3) defendants did not

3    order plaintiffs to disperse.[8]  Defendant Martel argues that there was probable cause to arrest plaintiffs

4    for the violations they were cited for, as well as for others for which they were not cited.

5         The Fourth Amendment requires that law enforcement officers have probable cause to make an

6    arrest without a warrant.  "To determine whether an officer had probable cause to arrest an individual,

7    we examine the events leading up to the arrest, and then decide whether these historical facts, viewed

8    from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland*

9    *v. Pringle*, 540 U.S. 366, 371 (2003) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  "[A]n

10   arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of

11   probable cause." *Davenpeck v. Alford*, 543 U.S. 146, 153 (2004).  "That is to say, [an officer's]

12   subjective reason for making the arrest need not be the criminal offense as to which the known facts

13   provide probable cause." *Id.*  Consequently, so long as there is objectively reasonable probable cause

14   for an offense, not solely for the offense for which an individual is cited, an arrest may be lawful.  *See*

15   *id.*

16        Here, the Court finds that there was probable cause to arrest plaintiffs for violating Vehicle Code

---

18        [6] Section 2800(a) states: "It is unlawful to willfully fail or refuse to comply with a lawful order,
19   signal, or direction of a peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title
     3 of Part 2 of the Penal Code, when that peace officer is in uniform and is performing duties pursuant
20   to any of the provisions of this code, or to refuse to submit to a lawful inspection pursuant to this code."

21        [7] Section 21954(a) states: "Every pedestrian upon a roadway at any point other than within a
     marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all
22   vehicles upon the roadway so near as to constitute an immediate hazard."

23        [8] Plaintiffs also argue that the SFPD impliedly gave them permission to protest in the street by
     "facilitating" the demonstration for most of the day and that prior to encircling the protestors the police
24   failed to give notice that they were "seeking to revoke the permission they had implicitly given plaintiffs
     to march." Opp'n at 12.  Plaintiffs cite the deposition of Lt. David Lazar in *Brudett v. Reynoso, et al.*,
25   No. C 06-720 JCS, to suggest that the SFPD typically facilitates un-permitted protestors, provided they
     are peaceful.  Rosenfeld Decl., Ex. 8 at 147:6-15.  Defendant Martel contends that the SFPD was not
26   present to facilitate the protest, but to restore order and effectuate arrests.  Martel Decl. ¶¶ 8-9.  In any
     event, the Court finds that even if the SFPD "facilitated" the protest in which plaintiffs were involved,
27   Martel was not precluded from ordering arrests when the situation deteriorated.  *See Town of Castle
     Rock, Colo. v. Gonzales*, 545 U.S. 748, 761 (2005) (affirming common sense notion "that all police
28   officers must use some discretion in deciding when and where to enforce city ordinances'") (quoting
     *Chicago v. Morales*, 527 U.S. 41, 62 (1999)).

§ 21954(a) – failure to yield to traffic by walking in the Market Street roadway.  Plaintiffs have stipulated that at the time the SFPD officers encircled them, they were "standing in the roadway and/or bike lanes/paths."  Loebs Decl., Ex. F ¶ 1.  There is no language in § 21954(a) to suggest that police officers must order pedestrians to disperse, or wait until an "immediate hazard" exists before arresting a pedestrian in a roadway.  Therefore, Martel's decision to arrest the protesters on Market Street was objectively reasonable.  Accordingly, the Court GRANTS defendants' motion for summary judgment on plaintiffs' federal false arrest claim against Captain Martel.

### B.  Unreasonable detention at 5th and Market Streets – federal claim

Plaintiffs argue that the length and condition of their detention near 5th and Market Streets was unreasonable and violated their Fourth Amendment rights.  Plaintiffs contend that it was unreasonable to detain them in the street for approximately four hours before taking them to the County Jail, and they allege that they were denied access to food and bathrooms while detained.  TAC ¶ 45.   Defendant Martel contends that the length and condition of their detention was reasonable under the circumstances considering the challenge of processing and organizing approximately 116 detainees.  *See* Martel Decl. ¶¶ 12, 15.

"The state is constitutionally permitted to detain all misdemeanor arrestees for the usual post-arrest procedures," and thus individuals do "not have a constitutional right to immediate liberty once they [are] subjected to a lawful arrest."  *Higbee v. City of San Diego*,  911 F.2d 377, 379 (9th Cir. 1990).  Generally, whenever any person is arrested by a peace officer for a misdemeanor, that person shall be released unless one of the enumerated reasons for nonrelease exist.  Cal. Penal Code § 853.6(I).  Reasons for nonrelease include when the arrestee cannot provide "satisfactory evidence of personal identification" or there is "a reasonable likelihood that the offense or offenses would continue or resume."  *Id.*

Even when an arrest and detention is lawful, to comply with the Fourth Amendment, the manner in which police carry out the detention must be reasonable under the circumstances.  *Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994).  The test for determining whether a detention was reasonable is an objective one, "on the basis of the facts and circumstances confronting the officers."

9

*Id.* "[A] detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged [.]" *Id.* at 876 (finding detention unreasonable when officers removed a gravely ill and partially naked man from his sickbed without providing any clothing or covering, and then forced him to remain sitting handcuffed in his living room for two hours, when officers knew he was not a threat and was unable to walk or sit unaided).

Here, plaintiffs have not provided evidence of the unreasonableness of the detention beyond affirming the TAC's general allegation that the police "detained plaintiffs there for hours, without giving them access to food or bathrooms." TAC, ¶ 45; *See* Rosenfeld Decl., Ex. 1. (plaintiffs' declarations affirming and verifying the allegations in the complaint). Martel acknowledges in his declaration that the detention lasted several hours, but states that it was reasonable under the circumstances because SFPD officers had to "obtain a case number, take photographs, and complete an arrest report" for each of the 116 detainees. Martel Decl. ¶ 12. Plaintiffs have not produced any evidence to show that police officers intentionally delayed the processing procedures or otherwise failed to act diligently. Furthermore, Martel states that it would not have been feasible to transport the arrestees to public bathroom facilities or provide them with food because the arrests occurred during rush hour, there were no bathroom facilities in the arrest area, and the officers were not equipped to provide food at that location. *Id.* ¶¶ 15-16. Finally, Martel states that no arrestee asked him for food or access to a bathroom, he did not order any officer to deny plaintiffs access to food or bathrooms, and he was not aware of any such request or denial. *Id.* ¶ 14. Martel also states that he believed that if released, the plaintiffs would continue to block roadways, fail to yield to traffic, and engage in the same conduct for which they were arrested. *Id.* ¶ 10. Plaintiffs have provided no evidence to the contrary.

On this record, the Court finds that detention of plaintiffs near 5th and Market Street was reasonable under the circumstances. *See United States v. Sharpe*, 470 U.S. 675, 688 (1985) (finding detention reasonable when police acted diligently and suspect's actions contributed to the added delay about which he complained). Accordingly, the Court GRANTS defendants' motion for summary judgment on plaintiffs' federal unreasonable detention claim against Captain Martel.

**C.     Unreasonable detention in County Jail - federal claim**

Plaintiffs allege that their detention in the County Jail was unreasonable because there was no probable cause for their arrest. TAC ¶ 46. As set forth above, the Court finds that defendant Martel had probable cause for plaintiffs' arrest. Furthermore, plaintiffs' refusal to provide identification and Martel's belief that plaintiffs would continue to block roadways, fail to yield to traffic, and engage in the same conduct for which they were arrested, warranted plaintiffs' nonrelease and subsequent detention in the County Jail. *See Higbee*, 911 F.2d at 380 (plaintiffs had no constitutional right to be released without being booked or posting bail once lawfully arrested). Accordingly, the Court GRANTS defendants' motion for summary judgment on this issue.

**D.     State claims**

Plaintiffs' state law claims for false arrest and imprisonment fail for the same reasons that their federal claims do. Consequently, the Court GRANTS defendants' motion for summary judgment on plaintiffs' Cause of Action Two.

**IV.     Excessive force claims**

**A.     Per se reasonableness of force used by SFSD Officers**

In the third cause of action, plaintiffs allege that various SFSD defendants used excessive force to remove plaintiffs from their holding cells and to compel them to comply with the required booking process. TAC ¶¶ 52-100. Plaintiffs argue that any use of force was unreasonable per se because it was unnecessary. Plaintiffs assert that they were already under the authorities' control in a secure location, and that defendants should have sought the intervention of plaintiffs' lawyers and/or a court to "solve the impasse" of plaintiffs' refusal to leave the holding cells or comply with the booking process. Defendants argue that they were authorized to use force because plaintiffs refused to exit the holding cells as ordered, and/or refused to comply with the booking process.

Force used without a legitimate purpose is unreasonable per se. *See Fontana v. Haskin*, 262 F.3d 871, 881 (9th Cir. 2001) ("There is no situation that would justify any amount of purposeful sexual verbal and physical predation against a handcuffed arrestee."); *see also Alexander v. City and County*

11

United States District Court
For the Northern District of California

*of San Francisco*, 120 F.3d 1355, 1367 (9th Cir. 1994) (deployment of a SWAT team for the purpose of inspecting property could be excessive, whereas SWAT team could be appropriately used to arrest violent homeowner).  Here, there is no dispute that the officers used force for the legitimate purpose of extricating plaintiffs from the holding cells and compelling plaintiffs to comply with booking procedures.  Because the officers used force towards obtaining the legitimate purpose of booking plaintiffs, the Court finds that the force applied was not unreasonable per se.

**B.      Reasonableness of forced used by SFSD officers under the circumstances**

Plaintiffs also contend that the particular force used by defendants was excessive under the circumstances.  Defendants argue that at no point did any officer kick, punch, hit or use any weapon against any of the individual plaintiffs.  Loebs Decl., Ex. C ¶¶ 3-6; Waters Decl. ¶¶ 11-13. Accordingly, defendants argue that all force used was reasonable as a matter of law.

The Fourth Amendment requires that law enforcement officers use only reasonable force.  The inquiry into reasonableness is an objective one based on the totality of the circumstances.  *Forrester v. City of San Diego*, 25 F.3d 804, 806 (9th Cir. 1994) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).  Relevant factors to be considered include the "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 806 n.2 (quoting *Graham*, 490 U.S. at 396).  The reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake."  *Id.* at 806 (quoting *Graham*, 490 U.S. at 396-97).  Law enforcement officers are "not required to use the least intrusive degree of force possible."  *Id.* at 807.  Rather, the question is whether the force used was reasonable, viewing the facts from the perspective of a reasonable officer on the scene.  *Id.* at 807-08.

Law enforcement officers may to use force to compel compliance if it is reasonable under the circumstances.  *Forrester v. City of San Diego*, 25 F.3d at 807.  Resolving all factual disputes in favor of the plaintiffs, the Court finds that the force used against plaintiffs Allen, Bates, Brydum, Connell, Dervin, Manger,  Rasti, Sorensen, Sovik, and Wing was not unreasonable.  Each of these plaintiffs

United States District Court
For the Northern District of California

1   admittedly refused to comply with either their extraction from the holding cells, the booking process,

2   or both.  *See* TAC ¶¶ 53-99.  Although plaintiffs assert that they "did not put up any active resistance,"

3   i.e., they were "'sitting peacefully, were easily moved by the police, and did not threaten or harm the

4   officers'" (Pl.'s Opp'n at 30 (citing *Headwaters Forest Defense v. County of Humboldt*, 276 F.2d 1125,

5   1130 (9th Cir. 2002)), the police video jointly submitted by the parties flatly discredits that assertion

6   such that no reasonable jury could believe that these plaintiffs did not actively resist.  Joint Submission

7   of Video Evidence for Court's Consideration on Summary Judgment, Per Court's Order of August 7,

8   2007 ("Video Evidence").  Thus, the Court views these facts as depicted in the videotape.  *See Scott v.*

9   *Harris*, 127 S. Ct. 1769, 1776 (2007).  The video shows these plaintiffs interlinking arms and legs with

10  other arrestees after being ordered to leave a holding cell, going "limp" and refusing to leave a holding

11  cell, and refusing to comply with the physical components of the booking process (e.g. fingerprinting):

12  these acts all constitute active resistance to the orders of law enforcement officers.  After reviewing the

13  facts in the light most favorable to plaintiffs, the Court finds that the extent of force used by defendants

14  was not unreasonable.

15      Plaintiffs do not contend, nor does the Video Evidence show, that defendants hit, kicked, or

16  pushed them.  Moreover, defendants assert that they discontinued all use of force against plaintiffs as

17  soon as they complied with police orders.  Loeb Decl., Ex C1 at 3, 7, 11, 15, 19, 23, 27, 31, 35, 39, 43,

18  47. The Video Evidence supports defendants' assertion.  While plaintiffs argue that there were available

19  alternatives to the use of force, the Court finds that the SFSD deputies were not required to exhaust all

20  alternatives, nor to use the least intrusive method of force.  *See Forrester*, 25 F.3d at 808-09.  The Court

21  GRANTS defendants' motion for summary judgment on the federal excessive force claims of plaintiffs

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

Allen, Bates, Brydum,[9] Connell, Dervin,[10] Manger,  Rasti, Sorensen,[11] Sovik,[12] and Wing.

The Court also finds that force used against plaintiff Silverman was reasonable under the circumstances.  Silverman alleges that after plaintiff Bates was extracted from the holding cell, Silverman stood up and went to the door stating that she wanted to remain with Ms. Bates.  TAC ¶ 78. Silverman states that although she was complying and submitting, defendants Rice and Chiu slammed her face down on the floor and defendants Wong, Freeman, Jang and Camberos roughly cuffed her wrists and ankles.  *Id.*  Silverman further alleges that Freeman, Jang and Doe #16 then suspended her in the air before placing her in a wheelchair.  *Id.*  The video, however, discredits Silverman's assertion of compliance.  Video Evidence, Ch. 18-19: Lorena Silverman TAC ¶ 78 (Camera M1): Hallway.  The video clearly depicts Silverman running out of the holding cell yelling that she wanted to stay with Bates.  *Id.*  The officers stopped her by grabbing her and forcing her to the ground, face down.  *Id.* Silverman continued to yell "I must be kept with that woman at all times!" while officers cuffed, shackled her, and lifted her into the wheelchair.  *Id.*  Although she was suspended in the air during the few moments it took for them to move her from her face-down position on the ground to a seated position in the chair, the suspension was not prolonged and was the natural result of the maneuver.  *Id.* Silverman continued to yell "I must be kept with that woman at all times" while the officers wheeled her into a nearby holding cell and seated her on a bench.  *Id.*  As soon as the officers let go of Silverman, she immediately stood up and took a step or two forward as though she were prepared to run from the

---

[9]  Although Brydum asserts that she cooperated during the fingerprinting process, in her answer to Hess' interrogatory number 12 which asked "If at any time YOU failed to cooperate in any way with the fingerprinting process . . . please describe exactly how YOU failed to cooperate," Brydum admitted, "I pulled my hands away, clenched my fists and tried to keep my arms to my sides."  Opp'n, Ex. 2 at 25.

[10]  Although Dervin asserts that he cooperated during the fingerprinting process, in his answer to Hess' interrogatory number 12, Dervin admitted that he "intentionally smudged the prints" and "scratched my fingers a bit."  Opp'n, Ex. 2 at 25.

[11]  Because the Court finds that Doe #17's use of force against plaintiff Sorensen was objectively reasonable under the circumstances, the Court need not reach the issue of whether Sorensen is entitled to proceed on that claim.

[12]  Although Sovik alleged that he cooperated during the fingerprinting process, in his answer to Hess' interrogatory number 12, Sovik admitted, "I did not put my hands on the fingerprint machine where I was asked/told to.  I went limp.  I also might have tried to pull my hands away from the machine."  Opp'n, Ex. 2 at 26.

cell again.  *Id.*  The officers quickly exited and closed the door behind them.  *Id.*  Silverman's actions were not compliant, and the Court finds that the extent of force used by defendants to regain control over Silverman after she ran out of the holding cell was objectively reasonable under the circumstances. Accordingly, the Court GRANTS defendants' motion for summary judgment on plaintiff Silverman's federal excessive force claims against defendants Wong, Freeman, Jang, Camberos, Rice, Chi and SFSD Doe #16.

The Court finds, however, that defendants are not entitled to summary judgment on all of the excessive force claims of plaintiffs Scheets, Spafford and Stribling-Uss, as there are genuine issues of material fact as to whether the extent of force used by certain defendant SFSD officers was reasonable. These claims are examined below.

### 1. Christopher Scheets v. Robert Rood, John Lawsha, Vincent Quock, Michael Mohn, Julia Molina, Kenneth Simon and Victor Lee

Plaintiff Scheets admits to actively resisting defendants' orders to exit the holding cell and to comply with the fingerprinting process.  Defendants Lawsha, Rood, Quock, Mohn and Molina used various forms of force such as putting Scheets' arms behind his back and shackling his ankles to compel his compliance.  TAC ¶ 69-74.  The Court finds that the use of force against Scheets during his resistance was objectively reasonable under the circumstances, and GRANTS defendants' motion for summary judgment on Scheet's federal excessive force claims against defendants Rood, Lawsha, Quock, Mohn, and Molina.

Scheets further alleges, however, that defendant Simon continued to apply injuring force after Scheets complied with fingerprinting.  *Id.* ¶ 74.  Scheets also alleges that defendant Lee twisted and injured Scheet's left wrist and hand while escorting him back to a holding cell after fingerprinting even though Scheets was cooperating at the time.  *Id.* ¶ 75.  Defendants argue that Scheets' allegations are contradicted by the video showing Scheets resisting as Lee walked him back to the cell.  The video depicts Scheets initially complying with the fingerprinting process, and the officers do not appear to be using any force.  Video Evidence, Ch. 17: Christopher Scheets TAC ¶¶ 74-75: (Camera M2) Fingerprinting and Return to Holding Cell.  Later the video depicts Scheets resisting fingerprinting by

United States District Court
For the Northern District of California

tightly closing his fist, at which point the officers applied pain techniques, apparently bending Scheets' wrist. *Id.* Scheets, visibly in pain, asked the officers to let go of his hand. *Id.* Scheets does not appear to be resisting, but the officers continued to apply pain techniques during the fingerprinting and the walk back to the cell. *Id.* Drawing all inferences in favor of plaintiff Scheets, the Court cannot say as a matter of law that the force used against Scheets was reasonable under the circumstances. Consequently, the Court DENIES defendants' motion for summary judgment on plaintiff Scheets' federal excessive force claims against defendants Simon and Lee.

## 2. Jeremy Spafford v. Dennis Hughes, John Lawsha, Robert Rood, Leonard Lamug and Basilio Alviar

Plaintiff Spafford admits to resisting SFSD officers' orders to leave the holding cell by interlinking his arms and legs with other detainees. TAC ¶ 88. The Court finds, therefore, that defendant Lawsha's and Rood's use of force by applying pressure to various parts of Spafford's body to remove him from the cell, and defendants Hughes' and Lamug's use of force to handcuff him outside the cell were objectively reasonable under the circumstances. Accordingly, the Court GRANTS defendants' motion for summary judgment on plaintiff Spafford's federal excessive force claims against defendants Lawsha and Rood, and against Hughes and Lamug with respect to handcuffing Spafford outside the cell.

Spafford further contends that although he was cooperating at the time, defendants Hughes and Lamug painfully bent his wrists while walking him across a parking lot to the booking area *Id.* ¶ 89. Defendants contend that Spafford has not submitted a specific declaration against any of the defendants. The video depicts Spafford being escorted backwards through the parking lot by four officers. Video Evidence, Ch. 25: Jeremy Spafford TAC ¶¶ 88-89 (Camera M2) Extraction, Parking Lot, and Holding Cell. The officer on Spafford's right appears to be using one hand to bend Spafford's wrist. *Id.* The officer on Spafford's left appears to have a hand on Spafford's arm. *Id.* The remaining two officers are walking behind Spafford but not touching him. *Id.* Spafford does not appear to be resisting. *Id.* In light of the strenuous active resistence from Spafford moments earlier as officers tried to extract him from his cell, the Court finds that the force used to maintain control over Spafford as officers escorted

United States District Court
For the Northern District of California

1    him through the parking lot to be reasonable under the circumstances.  Accordingly, the Court GRANTS

2    defendants' motion for summary judgment on plaintiff Spafford's federal excessive force claims against

3    defendants Hughes and Lamug with respect to the walk across a parking lot.

4          Spafford also argues that defendants Hughes, Lamug and Alviar pressed his head into a wall and

5    unnecessarily twisted his arms while searching him.  *Id*. ¶ 89.  The video depicts the search and

6    expressions of pain on Spafford's face, but there are so many officers in the holding cell that it is unclear

7    from the video whether Spafford was resisting and whether the force used was reasonable.  Video

8    Evidence, Ch. 25: Jeremy Spafford TAC ¶¶ 88-89 (Camera M2) Extraction, Parking Lot, and Holding

9    Cell.  Considering the evidence in the light most favorable to the plaintiff, the Court declines to rule as

10   a matter of law that defendants Hughes, Lamug and Alviar used only reasonable force against Spafford

11   while searching him in the holding cell.  Consequently, the Court DENIES defendants' motion for

12   summary judgment on this issue.

13

14

15          **3.    Jonathan Stribling-Uss v. John Lawsha, Richard Drocco, Robert Rood, Albert Jang and Albert Waters III**

16          Defendant Stribling-Uss admits that he resisted orders to leave the holding cell by interlinking

17   arms and legs with other detainees.  TAC ¶ 92.  Stribling-Uss alleges that defendant Lawsha pressed a

18   shield against his back, defendants Jang and Drocco pressed various parts of his body, and defendants

19   Drocco and Rood dragged him out of the cell.  *Id*. ¶¶ 92-93.  The Court finds that even when drawing

20   inferences in favor of the plaintiff, the force used by defendants Lawsha, Drocco, Rood and Jang to

21   remove Stribling-Uss from the cell was objectively reasonable under the circumstances and GRANTS

22   summary judgment on these claims.

23          Stribling-Uss further alleges that defendant Waters III threw him against a wall once he was in

24   a new holding cell, even though he was not resisting at the time.  *Id*. ¶ 95.  Defendants argue that

25   Stribling-Uss was kicking and screaming (but do not state that Stribling-Uss was kicking Waters III or

26   any other person), and therefore that defendant Waters III's use of force was not unreasonable.  In the

27   video, there are so many officers in the holding cell with Stribling-Uss that it is impossible to see what

28   force was used or if Stribling-Uss was actively resisting at the time.  Video Evidence, Ch. 28-29:

**United States District Court**
For the Northern District of California

Jonathan Stribling-Uss TAC ¶ 95 (Camera M1, Camera M2) Holding Cell.  On this record, the Court cannot rule as a matter of law that Waters III's use of force against Stribling-Uss was reasonable and therefore DENIES defendants' motion for summary judgment on this issue.

### C.      Excessive force claims against SFSD Supervisors

In their seventh cause of action, plaintiffs contend that supervisory defendants SFSD Chief Tom Arata, Chief Albert Waters III, Captain Ellen Brin, Lieutenant Kenneth Ferrigno, Lieutenant Wayne Hess, Sargent Paul Miyamoto and Sargent Matthew Freeman are liable for ordering, supervising, acquiescing in and/or participating in the use of excessive force against various plaintiffs at some point during their detention in county jail. TAC ¶ 113. Defendants argue that there is no *respondeat superior* for Section 1983 claims.

The Court finds that there can be no liability for SFSD supervisors under 42 U.S.C. § 1983 unless there was use of excessive force by SFSD deputies.  Because the Court in its above analysis found that no excessive force was used against plaintiffs Allen, Bates, Brydum, Connell, Dervin, Manger, Rasti, Sorensen, Sovik, and Wing, the Court GRANTS defendants' motion for summary judgment on supervisor liability for excessive force claims of these plaintiffs.  For the same reason, the Court also GRANTS defendants' motion for summary judgment on supervisor liability for the excessive force claims of plaintiffs Scheets, Spafford and Stribling-Uss with regard to the cell extraction issue, and the excessive force claim of plaintiff Spafford regarding his walk through the parking lot. Accordingly, the Court will only discuss supervisor liability for the excessive force claims of plaintiff Sheets with regard to fingerprinting and the walk back to the holding cell; and plaintiffs Spafford and Stribling-Uss with regard to the post-extraction holding cells.

Supervisors cannot be held liable under Section 1983 for the constitutional deprivations of their subordinates unless they participated in or directed the deprivations.  *Ybarra v. Reno Thunderbird Mobile Home Village, et al.*, 723 F.2d 675, 690 (9th Cir. 1984).  A supervisor can be held liable in his individual capacity "for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation[;] or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093

United States District Court
For the Northern District of California

(9th Cir. 1998) (internal quotation marks and citation omitted).  Liability depends upon whether the supervisor "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Id.* (jury could find supervisor liable when supervisor signed an internal affairs report dismissing a complaint of excessive force despite evidence of an officer's use of excessive force); *see also Blankenhorn v. City of Orange*, 485 F.3d 463,486 (9th Cir. 2007) (jury could find supervisor liable when supervisor approved officer's personnel evaluations "despite repeated and serious complaints against him for use of excessive force" and expert testimony detailed "the ineffectiveness of discipline for those complaints").

The only evidence plaintiffs have provided to show supervisory liability is that the supervisory defendants developed a plan to use force to compel the cell extraction and booking process when plaintiffs ignored verbal orders and otherwise actively resisted.  However, there is no evidence that the supervisory defendants directed, by action or inaction, the use of excessive force in the carrying of out the plan.  The Court finds plaintiffs' evidence insufficient to create an inference that the supervisors directed the alleged use of excessive force in three isolated incidents during the lengthy booking of numerous arrestees.  *See Ybarra*, 723 F.2d at 681 (showing of violation alone without evidence that supervisor knew or should have known or evidence of an affirmative policy was insufficient to establish triable issue of fact).  Stribling-Uss' excessive force claim against Waters III – which survives summary judgment because the video does not show the incident at issue – does not provide a basis for imposing *supervisory* liability against Waters III, as that claim only relates to Waters' own use of force against Stribling-Uss.  Accordingly, the Court GRANTS defendant's motion for summary judgment with respect to supervisor liability for alleged use of excessive force

### D.      Qualified immunity

Defendants contend that even if there are triable issues of fact on any of plaintiffs' excessive force claims, they are entitled to qualified immunity.  "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established" at the time of the arrest. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). *Saucier*'s requirement

United States District Court
For the Northern District of California

1   that the plaintiffs' asserted right be clearly established "does not mean that the very action at issue must

2   have been held unlawful before qualified immunity is shed." *Wall v. County of Orange*, 364 F.3d 1107,

3   1111 (9th Cir. 2004).   "Qualified immunity operates . . . to protect officers from the sometimes 'hazy

4   border between excessive and acceptable force,' [citation] and to ensure that before they are subjected

5   to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206; *see also Boyd v.*

6   *Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) ("In excessive force cases, the inquiry remains

7   whether, 'under the circumstances, a reasonable officer would have had fair notice that the force

8   employed was unlawful, and [whether] any mistake to the contrary would have been unreasonable.'")

9   (alteration in original) (quoting *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003)).

10       Here, defendants have provided evidence that they only used force when necessary to compel

11   compliance with extraction and booking procedures, and they discontinued all use of force against

12   plaintiffs as soon as they complied with police orders.   Loeb Decl., Ex. C1 at 3, 7, 11, 15, 19, 23, 31,

13   35, 39, 43, 47.   The remaining excessive force claims of Scheets, Spafford, and Stribling-Uss are based

14   on plaintiffs' allegations that certain defendants continued to apply force after they had stopped

15   resisting.   The Court denied summary judgment on these excessive force claims because the record is

16   unclear as to plaintiffs' actual compliance and defendants' actual use of force.   Because a jury could find

17   that defendants used excessive force in violation of plaintiffs' Fourth Amendment rights, the Court must

18   address the second step of the qualified immunity analysis.   Based on defendants' statements that they

19   only used force when necessary to compel compliance and discontinued all use of force as soon as

20   plaintiffs complied, the Court finds that defendants were on notice that use of force when plaintiffs were

21   no longer resistant or likely to resist was unnecessary and therefore unlawful.   Accordingly, the Court

22   finds that the defendants involved in the three excessive force claims that survive summary judgment

23   are not entitled to qualified immunity on these claims.[13]

24

25

---

26       [13]  To the extent that defendants contend that they are immune from plaintiffs' excessive force
claims under state law, the Court rejects that argument.   *See Scruggs v. Haynes,* 252 Cal. App. 2d 256,
27   60 Cal. Rptr. 355, 360 (1967) ("[A] peace officer making an arrest is liable to the person arrested for
using unreasonable force."); *Robinson v. Solano County,* 278 F.3d 1007, 1016 (9th Cir. 2002) (en banc)
28   ("California denies immunity to police officers who use excessive force in arresting a suspect.").

United States District Court
For the Northern District of California

**V.      State law assault and battery claims**

The parties agree that the standards for evaluating plaintiffs' state law assault and battery claims are the same as those for plaintiffs' federal excessive force claims.  Plaintiffs allege assault and battery in the fourth and eighth causes of action under Article I §§ 1, 7 and 13 of the California Constitution, and under California common law.[14]  Defendants argue that the supervisory defendants named in the seventh cause of action are immune from plaintiffs' state law claims under the California Tort Claims Act, Government Code §§ 820.2[15] and 820.8.[16]  Plaintiffs contend that defendants are not immune under either statute.

Accordingly, for reasons stated in the Court's analysis of the federal excessive force claims, the Court GRANTS defendants' motion for summary judgment on the state assault and battery claims of plaintiffs Allen, Bates, Brydum, Connell, Dervin, Manger, Rasti, Silverman, Sorensen, Sovik, and Wing. The Court also GRANTS defendants' motion as to plaintiff Scheets' assault and battery claims with regard to the cell extraction but DENIES defendants' motion on Scheets' state assault and battery claims related to fingerprinting and the walk back to the holding cell.[17]  The supervisory defendants, however, are entitled to summary judgment on Scheets' assault and battery claims because Scheets has not raised a triable issue of fact as to any supervisory defendants' personal involvement in the fingerprinting or the walk back to the holding cell.

---

[14]  As set forth above, the Court does not recognize plaintiffs' claims under the California Constitution.

[15]  California Government Code § 820.2 recites:  "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

[16]  California Government Code § 820.8 recites:  "Except as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person.  Nothing in this section exonerates a public employee from liability for injury proximately caused by his own negligent or wrongful act or omission."

[17]  As discussed *supra*, the Court granted summary judgment on the state claims of plaintiffs Silverman, Sovik, Spafford and Stribling-Uss due to their failure to file a government claim.

## VI.    Condition of confinement claims

In the fifth cause of action, plaintiffs allege that defendants Arata, Waters III, Brin, Ferrigno, Hess, Miyamoto and Freeman are liable under 42 U.S.C. § 1983 for violating plaintiffs' Fourth Amendment rights by ordering, supervising, acquiescing in, and/or participating in their detention under deplorable conditions.  Plaintiffs allege that the conditions of their detention in the "Salley Port" and the temporary holding facility, County Jail No. 9, were unreasonable under the Fourth Amendment because: (1) the SFSD did not provide them with blankets or bedding; (2) the SFSD did not give them access to toilets while they were in the Salley Port; (3) the SFSD did not provide soap, unclogged toilets and tampons; (4) SFSD officers created "peep shows" by opening a sliding cover on the door to the women's holding cell through which a view of the bathroom area could be seen; (5) the SFSD denied plaintiffs access to phones and counsel; and (6) the SFSD did not provide sufficient, "healthy enough," food, including vegetarian and vegan meals, as requested by certain plaintiffs.[18]

In order to evaluate plaintiffs' claims, it is necessary to have an understanding of the Salley Port and of County Jail No. 9.  Captain Ellen Brin, who was the acting facility commander for County Jail No. 9 during the events giving rise to plaintiffs' lawsuit, states in her declaration:

> On June 8, 2004 beginning at about 8:00 pm approximately 116 individuals were brought to the Salley Port outside of County Jail No. 9 ("CJ9") in connection with their arrests following a protest that occurred on or near Market Street, San Francisco earlier that day.
>
> Those individuals were held in the Salley Port until they could be cited and released, as was appropriate.  Approximately 75 individuals provided their identifying information and were eligible to be cited and released.  41 individuals, however, refused to provide their identifying information and were brought into the holding cells at CJ9.  The entire process of gathering the 116 individuals into the Salley Port, seeking to obtain their identification, securing their property, citing and releasing those individuals as was appropriate and identifying those who refused to provide their personal information lasted until approximately 11:45 p.m.
>
> While the individuals were in the Salley Port, they were provided access to water and bathroom facilities (port-o-potties).  The last of the approximately 41 individuals who refused to identify themselves was taken into CJ9 at approximately 11:45 [p.m.].  They were placed into two holding cells, one for the men and one for the women.

---

[18]   In a footnote, plaintiffs argue that a full factual record of the conditions of confinement has yet to be developed in discovery.  Plaintiffs did not, however, file a separate Rule 56(f) motion, nor did plaintiffs indicate, as they are required to do under Rule 56, what specific evidence is needed to buttress their claims.  Consequently, the Court declines to grant plaintiffs' request for more discovery.

1    Brin Decl. ¶¶ 2-4.  Officers extracted the first individual from CJ9 at approximately 6:00 pm the next

2    day, June 9, 2004.  *Id.* ¶ 22.  Captain Brin states that the extraction and booking process for the

3    remaining individuals who refused to cooperate took many hours, and that it is her understanding that

4    the last individual was extracted at approximately 2:00 am on June 10, 2004.  *Id.*

5              Captain Brin describes County Jail No. 9 as follows:

A Temporary Holding Facility under title 15 Minimum Standards for Local Detention
Facilities ("Title 15") is defined as a "local detention facility constructed after January
1, 1978, used for the confinement of persons for 24 hours or less pending release,
transfer to another facility, or appearance in court."  County Jail No. 9 has operated as
a Temporary Holding Facility[19] under these guidelines since it opened approximately 10
years ago.  (Definition under Section 1006 of Title 15).  As a Temporary Holding
Facility, the accommodations provided at CJ9 are limited when compared to those of a
Type II Housing Facility (such as County Jail No. 8) in a number of ways, such as the
following:

a.  Limited medical care to address immediate triage issues only at CJ9:
Medical care pertaining to examinations, detoxification treatment and the distribution
of medications is limited at CJ9.  Other long term medical care such as dietary needs,
dental care, individualized medical treatment plans, established sick call rounds, regular
clothing changes and other medical services are not available at CJ9.

b.  Classification screening at CJ9 is limited to Intake Classification Screening:
Additional classification screening occurs after the prisoner is moved out of CJ9 to
establish additional pertinent information to safely house and care for the inmate.
Prisoners who do not require special housing are housed in an Intake Housing Unit for
observation for up to 72 hours at the start of their incarceration to identify any problems
the prisoner may manifest with other prisoners individually or in a group living
environment.  This assessment assists in classifying each prisoner safely.  This level of
oversight does not occur at CJ9.

c.  CJ9 has group holding cells and does not provide individual cells to house
prisoners safely alone.

d.  Staff observation of prisoners held in group cells at CJ9 is made on
intermittent basis because of the jail design.  Our other jail facilities that provide for the
housing of inmates provide a safer level of inmate supervision by staff.

e.  Prisoners are housed in holding cells at CJ9 and until they complete the intake
screening classification interview they may exposed to other prisoners in those holding
cells who may be predatory, assaultive, vulnerable, mentally ill, under the influence of
narcotics or alcohol or gang members.  The classification screening assists in separating
prisoners who may be vulnerable from prisoners who are more criminally sophisticated.

─────────────────

[19] Captain Brin submitted a supplemental declaration in which she states that County Jail No.
9 is housed in the same building as County Jail No. 8, and that it is her understanding that the Board of
Corrections rated CJ8 as a Type II facility and did not separate CJ9 from their regulatory review.  Supp.
Brin Decl. ¶ 4.  According to Brin, however, CJ9 has always been operated as a Temporary Holding
facility, and CJ9 "presents all operational elements of a Temporary Holding facility as identified by Title
15."  *Id.* ¶¶ 5-6.

**United States District Court**
For the Northern District of California

f.  At CJ9 the following does not exist and is not provided because CJ9 operates as a Temporary Holding Facility:

(1).    Beds for sleeping
(2).    Mattresses or bedding (blankets and sheets)
(3).    Showers for prisoners to access
(4).    Hot meals
(5).    No inmate visiting other than legal visits
(6).    No library service
(7).    No exercise or recreation
(8).    No access to books, newspapers or periodicals
(9).    No inmate orientation
(10).   No religious services provided
(11).   Limited access to correspondence materials which limits inmate access to the courts and counsel
(12).   No inmate education program opportunities
(13).   No access to commissary
(14).   No access to telephone cards to make long distance telephone calls without calling collect
(15).   No diet meals (for medical or religious reasons)
(16).   No clothing exchanges after initial "dress-in" into jail clothing
(17).   No hair care services

*Id.* ¶ 5.

**A.    Constitutional standard**

The parties disagree whether their condition of confinement claims should be evaluated under the Fourth or Fourteenth Amendment.  Citing *Pierce v. Multnomah Country*, 76 F.3d 1032 (9th Cir. 1996), plaintiffs argue that the Fourth Amendment governs their condition of confinement claims because they were detained in County Jail No. 9 prior to an arraignment or a probable cause hearing. In *Pierce*, the plaintiff brought a § 1983 lawsuit after she was detained for four hours for identification following a citation for boarding a train without proof of payment of fare.  The *Pierce* plaintiff alleged that during her detention the police officers used excessive force against her, and at trial, the district court instructed the jury that the Eighth Amendment governed such claims.  The Ninth Circuit reversed, holding that the Eighth Amendment's prohibitions on the malicious or sadistic use of force did not apply until after conviction and sentence, and instead "that the Fourth Amendment sets the applicable constitutional limitations on the treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest." *Id.* at 1043.  Under that standard, the Court evaluates whether the challenged conditions were objectively reasonable. *Id.*

Defendants rely on *Bell v. Wolfish*, 441 U.S. 520 (1979), to contend that the Fourteenth

24

Amendment governs plaintiffs' claims.  In *Bell*, the Supreme Court held that the Fourteenth Amendment protected pretrial detainees – individuals who had been charged with a crime but not yet tried on the charge – from conditions of  confinement that amount to punishment.  *Id*. at 535.  "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'  Conversely, if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees."  *Id*. at 539.

The Court finds that under *Pierce*, the Fourth Amendment governs the analysis of plaintiffs' challenges to the conditions of their confinement.  However, the Court is guided by *Bell*, because a measure of objective reasonableness is whether the condition of confinement is reasonably related to a legitimate goal.  *See Thompson v. Los Angeles*, 885 F.2d 1439, 1444 & n.4 (9th Cir. 1989) (citing *Bell* and stating that test for whether prison regulation impinges on constitutional rights is whether regulation is reasonably related to legitimate penological interests).

## B.      Blankets/bedding

Plaintiffs contend that the SFSD's failure to provide blankets and bedding during their detention in County Jail No. 9 violated their constitutional rights because under CCR, Title 15, Division 1, Section 1270, mattresses and blankets are required even in a temporary holding facility if persons are housed for over twelve hours.  TAC ¶ 105(a).  Plaintiffs also assert in their opposition papers that defendants hung blankets around the holding cells to block views of the forcible extractions, and in doing so, acted maliciously.

Defendants argue that County Jail No. 9 operates as a Temporary Holding facility, and it is the "objective to release or transfer all arrestees within twelve (12) hours of delivery to CJR."  Supp. Brin Decl. ¶ 5.  Under those circumstances, there is no need to provide bedding and blankets to arrestees. In any event, defendants note that the Title 15 requirements, such as providing blankets, may be suspended in emergency situations under Title 15, Article 2, Section 1012.  Brin states,

[A]ll efforts to process the Plaintiffs for long-term housing were attempted once it was

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

clear they would not identify themselves or comply with directives to be processed. Given the large number of arrestees brought to CJ9 on June 8, 2006 and the resources available, my staff and I were operating as in an emergency mode. This emergency was due to the large number of arrestees still housed by their own election to obstruct the required process beyond the twelve-hour operational limit of CJ9. Furthermore, I was aware that their continued presence would interfere with subsequent acceptance of other arrestees that normally arrive regularly to a holding facility that has a numerical capacity as any jail does.

*Id.* ¶ 7.

The Court finds that on this record it was objectively reasonable not to provide plaintiffs with blankets and bedding while they were in County Jail No. 9. Even if it is not technically designated a Temporary Housing facility, County Jail No. 9 is operated as such, and arrestees are transferred to other jails for longer term housing. The Court finds it particularly significant that plaintiffs' prolonged detention in County Jail No. 9 was of their own making, as they could have been released at any time – including prior to being housed in County Jail No. 9 – if they simply provided their identification. Furthermore, the Court finds that the emergency situation created by plaintiffs excused any regulatory obligation to provide blankets. The fact that defendants hung blankets around the cells to block the view of the extractions is not evidence, as plaintiffs' claim, of defendants' "sadism" or "maliciousness." Rather, the Court finds it was objectively reasonable for defendants to block plaintiffs' views of the extractions in order to maintain order. The Court GRANTS defendants' motion for summary judgment on this issue.

### C.    Outside toilets

Plaintiffs allege that upon their arrival at County Jail No. 9, the SFSD held them in the Salley Port for over two hours for processing, and denied them access to toilets. TAC ¶ 105(b). Plaintiffs contend that while there were port-o-potties outside, they were denied access to them. However, the only evidence plaintiffs cite in support of this claim is plaintiff Sovik's unverified Response to Defendant Arata's Interrogatory No. 23, stating that "We were denied access to toilets and my requests went ignored." Rosenfeld Decl., Ex. 3, Sovik's Resp. to Arata's Interrog. #23. Defendants have submitted declarations stating that plaintiffs had access to mobile toilets while in the Salley Port. Kennedy Decl. ¶ 4.

United States District Court
For the Northern District of California

The Court finds that there is no evidence to support plaintiffs' claim that they were denied access to toilets while they were held in the Salley Port. However, even assuming plaintiffs' vague[20] allegations are true, the Court finds that there was a legitimate governmental reason for the alleged deprivation and that plaintiffs' claims fail as a matter of law. The SFSD held over one hundred protestors, including plaintiffs, outside in the Salley port upon their arrival at County Jail No. 9. Loebs Decl., Ex. G ¶ 3. Those protestors who provided identification were then released. *Id.* Trying to manage and process over one hundred people in an orderly fashion is not an easy task. If certain plaintiffs were not allowed access to toilets upon request, the Court finds that this was not unreasonable given the circumstances. The Court GRANTS defendants' motion for summary judgment on this issue.

### D.    Sanitation needs

Plaintiffs allege defendants denied them soap, working toilets and tampons in County Jail No. 9. TAC ¶ 105(c). Plaintiffs assert that the female detainees asked for soap and made defendants aware that certain toilets in the facility were clogged, but that defendants did not fix the problems. For support, plaintiffs cite the following interrogatory response by plaintiff Silverman:

> The female Does collectively created a list of demands, which were then communicated by a representative to multiple sheriff's deputies during each of their visits to our holding cells. To my recollection, our list of demands included 1) that all 38 individuals arrested on June 8th at Market and 5th be released simultaneously, without having to reveal our identities; 2) that any felony charges against other individuals arrested during the Reclaim the Streets demonstration be dropped; 3) that all 38 individuals arrested on June 8th at Market and 5th be held together at all times; specific demands for humane treatment while incarcerated, including 4) that each Doe arrestee have access to prescribed medications; 5) that we be fed three meals each day; 6) that we be given blankets and soap; and 7) that we have our clogged and overflowing toilet fixed and cleaned. I participated [in "jail solidarity"] for the reasons stated in answer to No. 19. I came to the decision while being detained in the street at Market and 5th for hours, after the limbo game, but before the dinosaur volley ball.

Rosenfeld Decl., Ex. 2, Silverman's Resp. to Def. Hess' Interrogatories #20. Plaintiffs also cite Magner's unverified response, which states that the toilet overflowed and defendants would not fix it. Rosenfeld Decl., Ex. 2, Magner's Resp. to Arata's Interrogatory #23. Defendants state that they did,

---

[20] The TAC simply alleges "deprivation of access to toilets upon [plaintiffs'] arrival at the jail." TAC ¶ 105(b). Sovik's unverified interrogatory response states, "We were denied access to toilets and my requests went ignored." Rosenfeld Decl., Ex. 3.

in fact, provide soap and tampons and unclog the toilets as soon as was possible.  Brin Decl. ¶¶ 8-9; Kennedy Decl. ¶ 4.

Plaintiffs' evidence does not raise a triable issue of fact on this claim.  As an initial matter, plaintiffs have not submitted any admissible evidence that they were denied soap, tampons, or that defendants refused to fix clogged and overflowing toilets; Silverman's response simply states that she and other female plaintiffs "demanded" soap and that the toilet be fixed and cleaned.  The only evidence in the record – defendants' declarations – states that plaintiffs were provided with soap and  tampons, and that clogged toilets were repaired.  Brin Decl. ¶¶ 8-9; Kennedy Decl. ¶ 4.  However, even assuming plaintiffs' vague allegations are true, defendants' failure to immediately respond to plaintiffs' requests for various sanitation supplies was reasonable under the circumstances.  Furthermore, as noted above, had plaintiffs provided their identification, or cooperated with the booking process, they would have been released or transferred to County Jail No. 8, where presumably their sanitation needs would have been met more readily.   Therefore, the Court GRANTS defendants' motion for summary judgment on this issue.

**E.**    **"Peep shows"**

Plaintiffs allege that male guards opened a sliding cover on the door to the women's holding cell and provided a view of the cell, including the bathroom area, to male guards and detainees.  TAC ¶ 105(d).  Plaintiffs do not, however, allege that any individual plaintiff was ever using the toilet when defendants opened the sliding cover.  *See id.* ¶ 132.  Furthermore, plaintiffs offer no specific evidence that defendants opened the sliding cover with intent to view women using the bathroom.  Defendants argue, on the other hand, that it is standard procedure for guards to periodically open the sliding cover to examine the cell for security reasons, and to determine the location of everyone in the cell.  Brin Decl. ¶ 10.  The Court finds that defendants had a legitimate reason for opening the sliding cover on the door to the women's holding cell, and thus that defendants' actions were objectively reasonable.  The Court GRANTS defendants' motion for summary judgment on this claim.

**F.**     **Access to phones and counsel**

Plaintiffs allege that they were denied access to phones and counsel while they were detained in County Jail No. 9 and after booking in County Jail No. 8.  TAC ¶ 105(e)-(f). Specifically, they allege that defendants periodically switched off phone service, therefore denying plaintiffs access to counsel. *Id.*   Plaintiffs have not submitted any specific evidence of their deprivation of counsel; the two interrogatory responses that plaintiffs cite are unverified.    Rosenfeld Decl., Ex. 3, Magner and Merrick's Resp. to Arata's Interrog. #23.  Defendants have submitted evidence showing that plaintiffs were given access to telephones after entering CJ9, and that plaintiffs met with their attorneys and plaintiffs' counsel was working on their behalf during their detention.  In addition, to the extent that plaintiffs complain about interruptions in the phone service while they were in the holding cells, Captain Brin's declaration states that detainees have access to telephones in the holding cells, but that when uncooperative detainees need to be extracted from the cells by force, the SFSD typically disrupts the telephone service while this is occurring for the safety of the staff and detainees.  Brin Decl. ¶ 11.

The Court finds that plaintiffs have not raised a triable issue of fact on this claim.  Plaintiffs have not submitted any admissible evidence showing that they were deprived of access to counsel or telephones, and the evidence in the record is to the contrary.   Accordingly, the Court GRANTS summary judgment to defendants on this claim.

**G.**     **Vegetarian and vegan meals**

Plaintiffs allege that defendants denied them "basic food and sustenance (including frequent enough food, healthy enough food, and food conforming to requested vegetarian and vegan diets)." TAC ¶ 105(g). Plaintiffs' interrogatory responses state the following complaints about the food:

- "The milk was lukewarm.  The peanut butter and jelly sandwiches consisted of moist bread, peanut butter wrapped in wax paper, and jelly in plastic packets."  (Allen)

- "The food was devoid of nutrition."  (Bates)

- "We had no food at all the first night of holding, and that was after being detained for the afternoon on Market Street without food.  I told the nurse that I had a strong moral objection to eating meat and dairy, and that I could not eat it if it was given to me.  From that point on, I was given only meat (ham, I think), and cheese."  (Brydum)

- "The food was lousy, and no alternative meals were offered to those who didn't eat meat or

1  animal products due to spiritual or moral concerns." (Connell)

2  •  "It is an animal product based meal: baloney, cheese, peanut butter, and bread. All of really low
   quality with little or no nutritional content. I don't eat animal products, so I ate the PB and
3  bread. The PB didn't even really taste like PB." (Dervin)

4  •  "It was extremely disgusting and there was no vegetarian or vegan option, or even kosher. A
   typical meal had two pieces of stale bread and baloney, and I don't eat swine. It seemed
5  designed to poison the body and spirit of the captives." (Kuhn)

6  •  "When they decided to remove us from the holding cell to be booked they chose to do this at the
   very time we would have been given dinner. Therefore, those who were eating did not eat until
7  very early the following morning." (Magner)

8  •  "It wasn't vegetarian. It was only sandwiches for over 24 hours. It wasn't healthy, especially
   for those who were vegan and had blood sugar problems. Also, I believe we weren't fed until
9  the morning after our arrest, which means we went many many hours with no food at all
   (counting the period of our detention on the street too)." (Merrick)
10

11  •  "I asked for food and waited a long time before receiving any. I was especially concerned for
   one female inmate who needed more regular access to food due to her hypoglycemia. We had
12  to ration portions of food to inmates who needed more. Also, we had to use some of our food
   to try to block the window which the guards used as a peepshow of the woman going to the
13  bathroom." (Rasti)

14  •  "The food was soggy, and inadequate to sustain a normal level of energy. Meals consisted of
   two slices of bread, peanut butter or cheese, one or two sandwich cookies, and a pint of milk."
15  (Scheets)

16  •  "Throughout the two and a half days at jail, I can only recall being fed three times. I informed
   several deputies and the processing nurse that I had a medical need, long-term hypoglycemia,
17  and therefore needed more food than was offered. We were detained on the street for hours
   without food, during dinner time. Throughout the evening following arrest, I was repeatedly
18  refused food when I clearly asked for it. Early the next [sic], we were fed two slices of white
   bread and a slice of American cheese. I asked for more food, specifically dairy free, several
19  times throughout the day, but was denied. The women in the holding cell with me responded
   by rationing our meals, and distributing the small amounts of barely edible food among each
20  other according to our various dietary needs. Next, we were fed two slices of white bread and
   a dollop of peanut butter. Also, they extracted us from our holding cells during dinner time,
21  interfering with dinner service. I was then refused food again throughout the night after
   processing. I received one meal the following morning, on June 10th. Then, despite our court
22  hearing getting pushed back repeatedly, extending our detention through two more meals, I do
   not recall being fed again." (Silverman)

23  •  "We weren't fed until well after we had arrived. I believe we were deprived of two meals at the
   beginning of our detention, and another meal on our last day as well." (Sorenson)
24

25  •  "Processed, stripped of nutrients, taste, and texture, with artificial substitutes added in." (Sovik)

26  •  "It was not good food, nor was there enough of it." (Spafford)

27  •  "We did not receive three meals a day. Our food was limited to bread, cheese, meat and globs
   of peanut butter." (Stribling-Uss)

28  •  "In protest, and as part of my jail solidarity, I did not eat while being held, as many people

30

complained about the lack of regular and decent food, including especially women who needed more sustenance based on medical issues." (Wing)

• "I am vegetarian and a lot of it was meat. Also, I am allergic to wheat, and every meal was mostly comprised of wheat (ie. bread)." (Zion)

Rosenfeld Decl., Ex. 2, Pls.' Resp. to Def. Hess' Interrogatory No. 2.

Captain Brin states that "[w]hile Plaintiffs were in the holding cells they were each provided with bag lunches, which typically consist of bread, cheese, peanut butter, cookies and juice three times a day. Because CJ9 is a Temporary Holding Facility, it is not able to accommodate special dietary requests. Once individuals are transferred to a Type II Housing Facility, special dietary requests can be accommodated." Brin Decl. ¶ 13.

The Court finds that no plaintiff has demonstrated a triable issue of fact on this claim. Plaintiffs' complaints that the food was not "good," that it was "processed," "soggy," "devoid of nutrition," that the "PB did not taste like PB," that the "extraction interfered with dinner service" and so forth border on frivolous. It is objectively reasonable that arrestees in a Temporary Holding facility are provided with cold meals of the type that were provided. At the risk of belaboring the obvious, plaintiffs were detained in County Jail No. 9 only because they refused to provide their identification. County Jail No. 9 was a temporary holding facility, not equipped to meet special dietary requests. *See* Brin Decl. ¶ 13. Plaintiffs needed only to provide their identification in order to be released. Even had they simply complied with the booking procedures, they would have been moved to Country Jail No. 8, a long-term facility equipped to meet detainees' dietary requests. *See id.* Accordingly, the Court finds that there is no triable issue regarding the constitutionality of the meals served to plaintiffs during their detention in County Jail No. 9. The Court GRANTS defendants' motion for summary judgment on this claim.

**VII. Sexual harassment/invasion of privacy claims**

In the ninth cause of action, all female plaintiffs bring suit under California state law against SFSD supervisory defendants Arata, Waters III, Brin, Ferrigno and Hess for invasion of privacy and sexual harassment for the alleged "peep shows." As discussed above, there is no evidence that SFSD officers created a "peep show" when opening the cover on the door to the female holding cells.

United States District Court
For the Northern District of California

Plaintiffs admit that "no plaintiff was actually using the toilet at the precise moment when the guard(s) created these potential peep shows." TAC. ¶ 132.   Accordingly, the Court GRANTS defendants' motion for summary judgment on female plaintiffs' claims of sexual harassment/invasion of privacy with regard to the alleged "peep shows."

Certain individual plaintiffs also bring suit against certain defendants for sexual harassment/invasion of privacy:  Rasti v. SFPD Does #23 and 24; Connell v. SFSD Doe #20; Dervin v. Le and Pericich; Merrick v. SFPD Doe #25; Silverman v. SFPD Doe #26; and Sovik v. SFPD Does # 27 and 28.  Plaintiffs allege that at different points during the arrest and detention process, certain defendants made sexually explicit and/or degrading comments (Rasti, Dervin, Merrick, Silverman, Sovik), and that post-extraction, plaintiff Dervin's pants slipped down and defendants did not allow him to pull up his waistband and instead sat him down in front of a female nurse.  TAC ¶¶ 135-40. Defendants argue that the individual claims fail because the facts alleged were not described in plaintiffs' government claims and should, therefore, be dismissed for failure to follow the mandatory claims procedure.

Defendants are correct that none of the facts described in the aforementioned individual plaintiffs' sexual harassment/invasion of privacy claims were alleged in plaintiffs' government claims. The only allegations of sexual harassment contained in the government claims related to the supposed "peep shows." Haase Decl., Ex. J, K.  Where there is a substantial variance between factual allegations in the government claim and the tort complaint, the complaint does not comply with the requirements of the Torts Claim Act. *See Fall River v. Superior Court*, 206 Cal. App. 3d 431, 433-34 (1988) (determining that a factual difference was too great to sustain a judgment on the pleadings where plaintiff alleged in his government claim that a school negligently maintained a door that struck his head, but alleged in his tort complaint that the school had negligently failed to supervise students engaged in horseplay).  In contrast, "[w]here the complaint merely elaborates or adds further detail to a claim, but is predicated on the same fundamental actions or failures to act by the defendants, courts have generally found the claim fairly reflects the facts pled in the complaint." *Stockett v. Assoc. of Cal. Water Agencies Joint Powers Ins. Auth.*, 34 Cal.4th 441, 447 (2004) (tort claim protesting wrongful termination sufficiently put employer defendant of wrongful termination claim; employee not required

to specify each theory of wrongful termination in tort claim).

Here, none of the sexual harassment allegations alleged in the complaint appear in plaintiffs' government claim. Unlike a further detail to a claim, or a different theory based upon the same factual predicate, the sexual harassment claims in the complaint are based on entirely different facts than those alleged in the tort claim. Consequently the government was not on notice of the claims against it, nor given the opportunity to investigate those claims. Accordingly, the Court GRANTS defendants' motion for summary judgment on the individual plaintiffs' sexual harassment/invasion of privacy claims.

## VIII.   First Amendment claims

In the tenth cause of action, plaintiffs have sued SFPD Captain Martel and SFSD supervisors Arata, Waters III, Brin, Ferrigno and Hess, for violating plaintiffs' First Amendment rights.[21] Plaintiffs allege that defendant Martel supervised their unlawful arrest and detention with the intent to punish them for their political protest. TAC. ¶¶ 142-43. Plaintiffs further allege that the SFSD supervisors ordered the use of unreasonable force and supervised unreasonable conditions of confinement as retaliation for plaintiffs' political beliefs. *Id.*

To prevail on their First Amendment claims, plaintiffs must provide evidence that defendants "deterred or chilled [plaintiffs'] political speech and such deterrence was a substantial or motivating factor in [defendants'] conduct." *Menotti v. City of Seattle*, 409 F.3d 1113, 1115 (9th Cir. 2005) (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir.1994)).

### A.     Captain Martel

Plaintiffs allege that Captain Martel knew the reason for plaintiffs' protest and ordered their arrest and detention on Market Street to punish them for exercising their First Amendment right to expression. TAC ¶¶ 142-43. They further argue that the San Francisco District Attorney rarely prosecutes protest-related offenses and that this is a source of bitterness to the SFPD. Rosenfeld Decl. ¶ 2. Consequently, they contend, a reasonable juror could infer that Martel intended to punish plaintiffs

---

[21] In their opposition, plaintiffs discuss defendants Freeman and Miyamoto as well. However, the Third Amended Complaint does not name these defendants in this claim.

United States District Court
For the Northern District of California

extra-judicially for their political speech.  Martel, however, declares that, "At no time was anything I said or did with respect to the plaintiffs . . . motivated by a desire or purpose on my part to interfere with or to retaliate against any plaintiff for anything that he/she said or expressed."  Martel Decl. ¶ 19.

The Court finds that plaintiffs' conclusory statements are insufficient to create a triable issue of fact as to defendant Martel's motive.  The evidence presented by plaintiffs is distinguishable from that in *Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir. 1994), where Mr. Sloman, a supporter of a ballot measure, brought suit against a police officer for violating his First Amendment rights.  In that case, there was evidence that the defendant had stopped Sloman, ostensibly for speeding, but instead took the opportunity only to criticize his bumper stickers.  *Id.* at 1469.  There was also evidence that the defendant had "routinely signaled Sloman out for warnings" during protests against the ballot measure. *Id.*  The Ninth Circuit determined that from such evidence the jury could infer that Sloman's political activity motivated the defendant's actions.  *Id.* at 1470.

Here, plaintiffs argue that a reasonable juror could infer intent to chill political speech simply because the SFPD knew of the reason for plaintiffs' protest and arrested them.  The Court finds, however, that such conclusory evidence is insufficient to defeat summary judgment.  Further, plaintiffs have stipulated that they were standing in the roadway blocking vehicular traffic at the time of their arrest; thus, there was a basis for arresting plaintiffs.  Without any specific evidence that Martel took plaintiffs' political expression into consideration, no reasonable juror could find that he had intent to chill their protected speech.  Consequently, the Court GRANTS defendants' motion for summary judgment on plaintiffs' First Amendment claims against Captain Martel.  The Court does not address the issue of qualified immunity here, as it finds there was no constitutional violation.

### B.     SFSD supervisory defendants

Plaintiffs allege that the SFSD supervisory defendants ordered and supervised the use of force against plaintiffs in the County Jail with the purpose of interfering and/or retaliating against plaintiffs' free expression of their political beliefs.  TAC ¶¶ 142-43.  Plaintiffs allege that the SFSD supervisory defendants planned the use of unnecessary force against plaintiffs upon their refusal to provide identification. Plaintiffs argue that a reasonable juror could infer the SFSD supervising officers intended

34

to terrorize plaintiffs based on their political affiliation.

The Court finds that plaintiffs' evidence against the SFSD supervisory defendants is merely conclusory. Plaintiffs offer no specific evidence that any of the named defendants even considered plaintiffs' political beliefs during their detention in County Jail. Simply stating that there was a use of force and such force was intended to chill political speech is insufficient to infer intent. The SFSD supervisory defendants declare that they used force because plaintiffs refused to comply with booking procedures in the County Jail, and that they used only that amount of force which was necessary. Loebs Decl., Ex. C. Plaintiffs offer no credible evidence to dispute this. Accordingly, the Court GRANTS defendants' motion for summary judgment on plaintiffs' First Amendment claims against the SFSD supervisory defendants. The Court does not address the issue of qualified immunity here, as it finds there was no constitutional violation.

## IX.    Trespass to chattels/conversion

Four plaintiffs – Dervin, Magner, Merrick and Rasti – allege that unnamed SFSD officers are liable for trespass to chattels and conversion. The third amended complaint alleges that plaintiff Dervin's sneakers were seized and never returned, plaintiff Magner's necklace was cut off and returned in an unrepairable state, plaintiff Merrick had Buddhist "blessed cords" cut from her neck and never returned, and plaintiff Rasti had three bracelets taken and returned broken. TAC ¶¶ 150-53. Because plaintiffs are unable to identify those responsible for the alleged violations, they have sued the City and County of San Francisco in *respondeat superior* for the allegedly tortious actions of its employees.

Defendants contend, *inter alia*, that plaintiffs' claims fail because even assuming plaintiffs' allegations are true, defendants are immune under state law. Defendants argue that SFPD and SFSD employees were acting within the course and scope of their employment when they either took or damaged plaintiffs' personal property, and thus that they – and their supervisors – are immune under Cal. Gov't Code §§ 820.2 and 821.6. Plaintiffs do not respond to the immunity argument.

The Court agrees that even assuming plaintiffs' allegations are true, defendants are entitled to summary judgment on these claims because of state law immunity. Plaintiffs allege that the damage and/or loss of their property occurred incident to the booking and detention process, and thus defendants

35

**United States District Court**
For the Northern District of California

1    were acting within the course of their employment and are immune.

2

3    **X.    Claims under California civil rights statutes**

4         Plaintiffs allege in the thirteenth cause of action that all defendants violated their civil rights

5    under the Bane Act (Cal. Civ. Code § 52.1(a)) and under the Ralph Act (Cal Civ. Code § 51.7(a)).  TAC

6    ¶¶ 155-56.  Plaintiff Rasti further alleges that defendants discriminated against her based on her status

7    as a woman of color and violated her rights under California's Unruh Act (Cal. Civ. Code § 51).  *Id.* ¶

8    157.

9

10        **A.    Bane Act**

11        In relevant part, the Bane Act states:

12        If a person or persons, whether or not acting under color of law, interferes by threats,
          intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion,
13        with the exercise or enjoyment by any individual or individuals of rights secured by the
          Constitution or laws of the United States, or of the rights secured by the Constitution or
14        laws of this state, the Attorney General, or any district attorney or city attorney may
          bring a civil action for injunctive and other appropriate equitable relief in the name of
15        the people of the State of California, in order to protect the peaceable exercise or
          enjoyment of the right or rights secured.
16
17   Cal. Civ. Code § 52.1(a).  Subdivision (b) of § 52.1 allows anyone whose rights have been interfered

18   with as described in subdivision (a) to sue for damages and equitable relief.  Plaintiffs' claim under the

19   Bane Act alleges:

20        defendants interfered by threats, intimidation and coercion with plaintiffs' rights to due
          process, and to be free from false and unreasonable arrest, imprisonment, illegal search
21        and seizure, assault and battery, interference with and retaliation for exercise of free
          expression, association, assembly, and petition, abuse of process, sexual harassment, and
22        unsafe and unsanitary conditions of confinement, as guaranteed by Article I, §§ 1, 2, 7
          and 13 of the California Constitution, and Cal. Civil Code §§ 43, 51.9, and 1708 . . .

23   TAC ¶ 155.

24        Defendants contend that plaintiffs' Bane Act claim fails because the Bane Act does not apply

25   to allegations of excessive force, false arrest or conditions of confinement unless plaintiffs can also show

26   that these actions were done to interfere with a separate state or federal constitutional right.  Defendants

27   rely on *Jones v. Kmart Corp.*, 17 Cal. 4th 329 (1998), which states that "Section 52.1 does require an

28   attempted or completed act of interference with a legal right, accompanied by a form of coercion."  *Id.*

at 334.  However, *Jones* addressed a different issue than that presented here, namely whether a plaintiff could recover under the Bane Act against a private entity for a violation of the Fourth Amendment.  The California Supreme Court held that while the Bane Act does not contain a state actor requirement per se, if the legal right that is the predicate of the Bane Act claim – there, the Fourth Amendment right to be free of unreasonable searches and seizures – only protects against state action, then the Bane Act claim also includes a state action element.  *Id.*  The *Jones* court implicitly recognized a Bane Act claim against a state actor based on a Fourth Amendment violation.  *Id.* at 334-35; *see also Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230, 1242 (2007) (comparing Bane Act and 42 U.S.C. § 1983 and noting  only two differences, neither relevant here).

Defendants also rely on the California jury instructions for a Bane Act claim, which include as an element that plaintiff "reasonably believed that if he exercised his right [insert right, e.g., "to vote"] defendant would commit violence against him or his property."  CACI Model Jury Instruction 3025.  However, plaintiffs contend that this instruction is poorly drafted, and note that the predecessor instruction did not include any separate element.  In light of the broad language of the Bane Act and the cases interpreting it, the Court is reluctant to add a "separate element" limitation based on the CACI instruction.

However, the Court finds that defendants are entitled to summary judgment on the majority of plaintiffs' Bane Act claim for all of the reasons set forth above.  The only Bane Act claims that survive summary judgment are the excessive force claims of Scheets, Spafford and Stribling-Uss as discussed in Section IV.B.1-3.  For those instances where the Court has determined a factual dispute exists with regard to certain plaintiffs' excessive force claims, the Court DENIES defendants' motion for summary judgment.  The Court also rejects defendants' claim of immunity based on state law.  *See Blankenhorn*, 485 F.3d at 487-88.

**B.      Ralph Act**

The Ralph Act provides in relevant part: "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation . . ."  Cal. Civ. Code § 51.7(a).  Plaintiffs allege that "defendants undertook the actions complained throughout this complaint out of animus toward plaintiffs

based on their political views, and their appearance and status as protesters and dissenters." TAC ¶ 156. However, as set forth above, plaintiffs have submitted no evidence that defendants' actions were motivated by animus towards plaintiffs' political affiliation.   Accordingly, the Court GRANTS defendants' motion for summary judgment on this issue.

### C.    Unruh Act

The Unruh Act recites in relevant part:

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges.

Cal. Civ. Code § 51(b).  Plaintiff Rasti alleges that defendants are liable under the Unruh Act for "separating her from and not housing her with any of the other female arrestees, and in taking her glasses." TAC ¶ 157.  From the facts alleged in plaintiffs' opposition it appears that after booking Rasti was held in a separate cell in County Jail No. 8.  Pls.' Opp'n. at 5.  Rasti contends that defendants discriminated against her because she is a woman of color.   As evidence, Rasti submits only a declaration which states, "I further verify and affirm the factual allegations set out under Claim Thirteen of the TAC which are attributed to me, if any (at ¶ 157), are true and correct, to the best of my knowledge."  Rasti Decl. ¶ 119.  Plaintiff argues this is sufficient to defeat summary judgment.

Defendants argue that plaintiff fails to state a cause of action for the conditions of her confinement or to produce any evidence that racial animus was the motivating factor in defendants' decision-making.  Defendants assert  that without any evidence of intent, plaintiff Rasti's Unruh action must fail.  Further, defendants cite the declaration of defendant Brin which states, "none of the Plaintiffs were ever housed separately from any of the other individuals because of their race."  Brin Decl. ¶ 30.

The Unruh Act protects individuals from intentional discrimination on the basis of their "sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation." Cal. Civ. Code § 51(b).  In *Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 1172 (1991), the California Supreme Court determined that "the language of the Act suggests that intentional acts of discrimination, not disparate impact, was the object of the legislation."  Here, plaintiff Rasti

United States District Court

For the Northern District of California

submits only the conclusory statement that the SFSD discriminated against her by "separating her from and not housing her with any of the other female arrestees, and in taking her glasses."  TAC ¶ 157. Plaintiff does not specifically rebut defendant Brin's sworn declaration that the SFSD's actions against Ms. Rasti were not motivated by racial animus.  Without any evidence of intent, the Court finds that plaintiff has not met her burden to defeat summary judgment.  Accordingly, the Court GRANTS defendants' motion for summary judgment on plaintiff Rasti's Unruh Act claim.

## XI.     Intentional infliction of emotional distress claims

Certain plaintiffs allege claims of intentional and negligent infliction of emotional distress (IIED and NIED) against certain defendants and against the City and County of San Francisco in *respondeat superior.* TAC ¶¶ 162-63.  Defendants argue that plaintiffs' NIED claims should be dismissed because the challenged conduct consists of intentional acts.  Plaintiffs' opposition papers focus solely on their IIED claims, and thus it appears that plaintiffs concede that their NIED claims fail as a matter of law. Consequently, the Court will only address plaintiffs' IIED claims.

The elements of the tort of IIED are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the possibility of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.  *See Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993).  Defendants argue that plaintiffs have not submitted sufficient evidence to suggest that any plaintiff has experienced "severe or emotional distress" because they have not indicated that their distress was substantial or long lasting.  Plaintiffs admit that only four plaintiffs, Bates, Dervin, Manger and Silverman, have presented claims for severe emotional suffering.  Plaintiffs do not, however, submit declarations from these plaintiffs describing their condition.  Plaintiffs request further discovery under F.R.Civ.P. 56(f), and suggest that counseling records and independent psychological examinations are needed in order to buttress their claims.  However, the Court finds that plaintiffs could have submitted additional evidence of their emotional distress at this stage – such as declarations from plaintiffs specifically describing their conditions – and that plaintiffs' failure to do so is fatal to their IIED claims.

United States District Court
For the Northern District of California

1    Moreover, the Court finds that there is no evidence that defendants' conduct was "extreme and

2  outrageous."  To meet this element of an IIED cause of action, a defendant's conduct must be "so

3  outrageous in character, and so extreme in degree, to go beyond all possible bounds of decency, and to

4  be regarded as atrocious, and utterly intolerable in a civilized community." *Villiarimo v. Aloha Island*

5  *Air, Inc.*, 281 F.3d 1054, 1068 (9th Cir. 2002) (citation omitted).  Here, the Court finds that defendants'

6  actions are not sufficient to allow recovery for intentional infliction of emotional distress, because they

7  cannot "reasonably be regarded as so extreme and outrageous as to permit recovery." *Schneider v. TRW,*

8  *Inc.*, 938 F.2d 986, 992 (9th Cir. 1991).  Accordingly, the Court GRANTS summary judgment on

9  plaintiffs' intentional infliction of emotional distress claim.

## XII.    Injunctive and Declaratory Relief

12    Plaintiffs seek injunctive and declaratory relief "to prevent law enforcement officers from

13  summarily and peremptorily punishing protestors in the manners alleged, and forcibly extracting them

14  from their holding cells, based on their political views, or status as protestors and dissenters, or because

15  they decline to identify themselves to their captors." TAC ¶ 164.  Defendants argue, however, that

16  plaintiffs fail to demonstrate that there is a substantial likelihood they will suffer an injury in the future

17  and, therefore, are not entitled to injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102

18  (1983).  Defendants contend that this requirement is not satisfied by the assertion that plaintiffs may be

19  incarcerated in the future. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974).

20    Plaintiffs argue that *Kolender v. Lawson*, 461 U.S. 352, 357 n.3 (1983), which found that where

21  the plaintiff was stopped by police 15 times in two years there was a "credible threat" that Lawson may

22  be detained again, relaxed the standard set forth in *Lyons*, and that there is a credible threat that in the

23  future the SFSD will respond to protesters refusing to identify themselves in the same manner as in the

24  present case.  The Court, however, finds *Lyons* controlling.  Here, there is no credible threat that the

25  same plaintiffs will refuse to follow the law in the future and will, therefore, be treated by the SFSD in

26  an allegedly draconian manner. *See Lyons*,  461 U.S. at 102.  Consequently, the Court GRANTS

27  summary judgment on plaintiffs' request for injunctive and declaratory relief.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and DENIES in part defendants' motion for summary judgment. [Docket No. 45] As set forth above, the Court GRANTS summary judgment in favor of defendants on all of plaintiffs' claims except the following: (1) Scheets' federal excessive force claims against Simon and Lee; (2) Scheets' state assault and battery claims against Simon and Lee; (3) Scheets' state Bane Act claim against Simon and Lee; (4) Spafford's federal excessive force claims against Hughes, Lamug and Alviar while searching him in the holding cell; (5) Spafford's state Bane Act claim against Hughes, Lamug and Alviar; (6) Stribling-Uss' federal excessive force claim against Waters III once Stribling-Uss was in the new holding cell; and (7) Stribling-Uss' Bane Act claim against Waters III.

**IT IS SO ORDERED.**

Dated: March 26, 2008

_____
SUSAN ILLSTON
United States District Judge